**OWENS et al. v. ANDERSON et al.**

**No. A–5226.**

United States District Court
D. Alaska. Third Division.
Anchorage.

Nov. 7, 1951.

Faulkner, Banfield & Boochever, Juneau, Alaska, John E. Manders, Anchorage, Alaska, Chadwick, Chadwick & Mills, Seattle, Wash., for plaintiffs.

Davis & Renfrew, Anchorage, Alaska, for defendants.

FOLTA, District Judge.

Plaintiffs seek to recover $34,487.97 in damages for breach of warranty as to the condition of a tug sold to the plaintiffs.

In 1946, at Seward, Alaska, the Army sold the tug involved in this controversy as surplus to the defendants, who used it in their transportation business. In February, 1947, the tug was taken to Seattle for repairs. En route she struck a rock and was anchored in a nearby harbor for the night so that the extent of the damage might be determined. After her arrival in Seattle, the defendants decided to sell the tug rather than have it repaired. At this juncture the plaintiff A. E. Owens appeared on the scene. His firm was in the market for a tug to be used in connection with its logging business in Alaska. The defendant J. C. Anderson showed him the tug and Owens made a casual inspection. Owens told Anderson that he was engaged in the logging business in Alaska and desired a tug for towing logs. Anderson replied that the tug was in fair condition with the exception that the crankshaft pin for No. 5 cylinder was scored and that the forefoot or the stem was damaged from striking a log on the trip to Seattle, but that the vessel did not leak. Anderson further told Owens that the tug could be put in first class shape for $5,000 and offered to sell it for $25,000 in its then condition, or for $30,000 repaired. Owens elected to make his own repairs and agreed to buy the tug for $25,000. The agreement was executed on April 1st, but the agreement not only does not even refer to the condition of the tug, but its purpose apparently was to provide for immediate transfer of possession pending receipt of a bill of sale from the Army, which was a prerequisite to documentation.

From the testimony it appears that although Owens has been engaged in the logging business for many years, during the course of which he has bought and operated boats, his knowledge of vessels was limited to what would ordinarily be acquired in traveling on them to and from his logging camps, and his inspection revealed no more than what was open and visible as the tug lay in the water. One piston had been removed from the cylinder and was made fast to the motor block. This was done because of overheating due to the scored crank pin. Thereafter the engine was operated on 5 of its 6 cylinders. An inspection of the engine by the witness Engstrom, the mechanical expert of the

Fairbanks-Morse Company, presumably the manufacturer of the engine, disclosed that all the main bearings were ruined and the main bearing journals scored and 1/8 inch over the original shaft diameter; that the drive gear was useless because of several broken teeth; that the water pump was completely obstructed; that the salt and fresh water pump shafts were bent and the bearings ruined; that the crank shaft was warped from excessive heat and no longer useful; that the oil columns were clogged with babbitt from the bearings and totally obstructed and that a makeshift oil line had been installed to provide lubrication. The base of the engine was also warped from excessive heat. Engstrom testified that the warping of the base of the engine and the crankshaft was caused by heat of such intensity as could be generated only by a fire ignited in the base from friction as a consequence of a total lack of lubrication.

The vessel was then placed in a dry dock, where an inspection revealed that the lower part of the stem, the entire forefoot, the forward end of the keel and the ends of the adjacent planks were almost completely splintered, that the stem plate hung by one end and that the forward watertight compartment was filled with water. It was also discovered that the tail shaft was oxidized from galvanic action or electrolysis to such an extent as to require replacement; that the battery required new plates; that the stuffing box was beyond repair and that the winches were frozen in consequence of rust and lack of lubrication.

It was proved that instead of striking a log, which would have caused relatively little damage to a tug of this size, the tug had struck a rock, and from the photographs of the bow, plaintiffs' exhibit No. 9 and 10, I am convinced that so much damage could not have resulted unless the vessel struck at full speed. The testimony of the defendant Anderson as to this incident was such as to seriously affect his credibility.

The plaintiffs contend that Anderson warranted that the vessel was tight and in good condition except for a bruised forefoot and a scored crank pin. Notwithstanding that the defendants admit they reported the vessel to be tight and in fair condition except for a scored crank pin and damaged forefoot, they contend that the tug was sold "as is". Not only do the plaintiffs deny this but an examination of the defendants' testimony warrants the conclusion that this contention is an afterthought. Anderson warranted the tug to be in fair condition with the exception noted. Having done so, he could not avoid the effect thereof by replying to Owens' inquiry, a few days later, as to his best price, that the price was $25,000 "as is". Under the circumstances, the only meaning that can be given the term "as is", assuming that it was used, is that it meant the condition already stated as fair with the exceptions referred to.

The applicable law is that of the State of Washington, Bulkley v. Honold, 19 How. 390, 15 L.Ed. 663, which has enacted the Uniform Sales Act, 7 Remington Revised Statutes, Sections 5836–1 et seq., the pertinent sections of which are as follows:

Sec. 12: "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty."

Sec. 15(1) (3): "Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

(3) "If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed."

Sec. 69(1)(a)(b), (6) & (7): (1) "Where there is a breach of warranty by the seller the buyer may at his election: (a) Accept or keep the goods and set up against the seller the breach of warranty by

way of recoupment in diminution or extinction of the price; (b) Accept or keep the goods and maintain an action against the seller for damages for the breach of warranty."

(6) "The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty."

(7) "In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damage of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty."

Since the defendant sold the tug for $25,000 and the plaintiffs claim it cost $27,487.97 to restore the vessel to the condition it was warranted to be in, it would appear either that the defendants sold the tug for far less than its value or that the plaintiffs had it completely overhauled. I am inclined to believe that much of the work was unnecessary to restore the vessel to the condition it was warranted to be in, for it is incredible that the value of a tug which cost $250,000 to build three years before had, because of a ruined motor and damaged bow, wear and tear and perhaps neglect, somehow depreciated to minus $2500.

I find that the tug was not sold "as is" but upon the express warranty that it was tight and in fair condition with the exceptions noted; and that this warranty was made with the intent that the plaintiffs should rely, and that plaintiffs bought the tug in reliance, thereon. I also find that although Owens examined the vessel, it was not, nor could it have been, such an "examination ought to have revealed", Sec. 15(3) Uniform Sales Act, the internal defects in the motor and the under water damage to the hull.

I further find that to restore the vessel to a fair condition it was reasonably necessary to, and that the plaintiffs did, expend $300 for turning the scored crank pin, $6,056.66 for a new crankshaft, $6,085.19 for labor and material in connection with the installation of the crankshaft and repair of the engine, $8,390.03 for repairs to the bow, $966.80 for supervision by the plaintiffs' representative Blanchard, a total of $21,798.68, from which the $5,000 which plaintiff expected to expend on repairs in accordance with the defendants' estimate, must be deducted, leaving as the amount allowed for repairs the sum of $16,798.68 as against $27,487.97 expended by the plaintiffs. I am inclined to believe that from the amount allowed for repairs should be deducted the equivalent of accrued depreciation for three years, the age of the tug, but in the absence of any evidence, no finding can be made on this subject.

The plaintiffs also claim $11,000 for loss of profit. This is based on the plaintiffs' estimate that of the total of 105 days consumed in making repairs, 75 days were consumed in restoring the tug to the condition it was warranted to be in. In view of the finding of the Court, it is obvious that the time basis should be in the same proportion to 105 days as $16,798.68 is to $27,487.97, or 64 days. From this must be deducted the 10 days consumed in making the trip to San Francisco to pick up a barge and towing it to Alaska, leaving 54 instead of 75 days for loss of profits, or $7,920.18 instead of $11,000. It should be noted that no proof of charter value for this 10-day period was submitted. I also find that the value of the life boat, which defendants borrowed from the plaintiffs' tug and failed to return, was $500.

Otherwise, I find that the vessel was in fair condition as represented and, hence, conclude that the claims for a new tail shaft, stuffing box, battery plates and copper paint should be disallowed. An examination of the bills discloses that the cost of labor was quite uniformly twice the material cost. I, therefore, find that $240, the cost of applying the copper paint should be deducted. I also find that it was not necessary for Owens to make four trips to Seattle and that the evidence as to what his crew did in assisting in the making of repairs and what his supervisor bought in tools and supplies for use in connection therewith, is insufficient to show that the

damages claimed for these items resulted from the breach and, hence, these claims are likewise disallowed.

Accordingly, I conclude that the plaintiffs are entitled to a judgment of $24,978.86 and that $900 should be allowed for attorney fees.